IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA                                              PLAINTIFF

V.                                                    CIVIL ACTION NO. 2:06CV00071-B-A

ROBERT B. BLASIO, INDIVIDUALLY;
KATHERINE FITZGIBBON, INDIVIDUALLY;
WESTERN LITIGATION SPECIALISTS, INC.;
AND EMCARE HOLDINGS, INC.                                              DEFENDANTS

**MEMORANDUM OPINION**

This cause comes before the court upon the motion of defendants Robert Blasio and Katherine Fitzgibbon to dismiss for lack of personal jurisdiction, the plaintiff's motion to strike the affidavit of Brent J. Hoffman, and the defendants' motion for summary judgment. Upon due consideration of the motions, responses, exhibits, and supporting and opposing authority, the court is ready to rule.

*Factual and Procedural Background*

The circumstances giving rise to this case originated with an underlying medical malpractice action brought by the wrongful death heirs of Patricia Wright in the Circuit Court of Coahoma County, Mississippi, in April 1999 against Dr. Cary Mettetal, Dr. Edwin Orr, Senatobia Community Hospital, and Emergystat, Inc. Ms. Wright was seen at the Senatobia Hospital emergency room by Dr. Orr on March 23, 1999, and again the next day by Dr. Mettetal. She died on March 26, 1999.

Drs. Mettetal and Orr were covered under a professional liability insurance policy issued by PHICO Insurance Company to EmCare, a physician practice management company with which the doctors were contracted to work in hospital emergency rooms. EmCare had a self-

insured retention (SIR) of $1 million per medical incident and $8.5 million aggregate for the policy year 1999. As additional insureds under the PHICO policy, the doctors each had $1 million per medical incident coverage.

Drs. Mettetal and Orr were further insured through a policy issued by the plaintiff, National Union Fire Insurance Company of Pittsburgh, PA, (NUFIC) to Paracelsus Healthcare Corporation Emergency Room Physicians. The NUFIC policy provided professional liability coverage in the amount of $1 million per incident but through the policy's "other insurance" provision served only as an excess policy if an insured was also covered under another insurance policy. Thus, with respect to the *Wright* case, since Drs. Mettetal and Orr each had primary coverage through EmCare's PHICO policy up to $1 million per medical incident, the NUFIC policy would not be applicable until those PHICO policy limits were met. Had no PHICO policy existed, the NUFIC policy would have been the primary coverage.

PHICO and NUFIC were notified of the *Wright* suit on April 22, 1999, though NUFIC asserts that it did not receive notice until mid-2000. PHICO reported the case to EmCare. Western Litigation Specialists, Inc., (WLSI), was retained as third party claims administrator to handle the EmCare claims. Defendants Blasio and Fitzgibbon were attorneys employed by WLSI. WLSI retained attorney Senith Tipton of Jackson, Mississippi, to defend Drs. Mettetal and Orr. Because of a potential conflict of interest, however, WLSI subsequently retained Tommie Williams of Greenwood, Mississippi, as additional counsel to represent Dr. Orr.

PHICO and EmCare were not initially aware of the existence of the NUFIC policy, and apparently NUFIC was unaware of the PHICO policy until sometime in 2000. The defendants allege that NUFIC received notice of the *Wright* case on the same date as PHICO but waited

2

several months before identifying itself and becoming involved in the litigation. The first mediation of the *Wright* case, which was held on December 14, 1999, was unsuccessful.

In early 2000, the *Wright* plaintiffs' attorney, John Cocke, informed Mr. Williams that the case could be settled for $2 million, but this statement was based on Mr. Cocke's false understanding that only a total of $2 million in insurance coverage was available to the doctors. After Mr. Cocke learned of the NUFIC coverage, he increased the settlement demand to $3 million.

NUFIC and its attorney, Wes Williams, asserted that it had no responsibility to respond to the *Wright* claim until PHICO had expended its $2 million coverage. The insurance companies continued to argue about coverage for several months.

The defendants assert that in late 2000 Mr. Blasio reached what he believed to be an agreement with Mr. Cocke that if $2 million were paid in settlement as to Dr. Mettetal, the *Wright* plaintiffs would dismiss the claim against Dr. Orr without payment. It is generally agreed that Dr. Mettetal was considerably more liable than Dr. Orr. Prior to the alleged agreement between Mr. Blasio and Mr. Cocke, Dr. Mettetal had demanded that NUFIC settle the *Wright* case within his insurance coverage of $2 million. Dr. Orr had also previously requested that the case be settled by a payment on his behalf. When Dr. Orr and his attorney learned of the alleged agreement to dismiss the entire case against him if $2 million were paid on Dr. Mettetal's behalf, Dr. Orr and Mr. Williams agreed to withdraw Dr. Orr's consent to settle, and Mr. Williams wrote to Mr. Blasio withdrawing that consent.

Dr. Orr's withdrawal of his consent to settle and the circumstances surrounding the withdrawal are, according to the plaintiff, the critical events which give rise to this case. NUFIC

3

asserts that Mr. Blasio, WLSI, and the other defendants improperly conspired to cause NUFIC to pay $1 million on behalf of Dr. Mettetal when that amount should have been paid by PHICO on behalf of Dr. Orr. The plaintiff contends that Dr. Orr's withdrawal of his consent to settle did not reflect his true position but was rather "produced at Mr. Blasio's request for use in an attempt to convince the other parties to the litigation that the claims against Dr. Orr could not be settled." NUFIC also alleges that the December 1999 mediation was unsuccessful because Ms. Fitzgibbon took the erroneous position that Drs. Orr and Mettetal had only $1 million in total available coverage. At a subsequent mediation in January 2001, Ms. Fitzgibbon advised the physicians' insurance carriers that PHICO could extend no more than $1 million to any settlement offer because Dr. Orr had withdrawn his consent to settle. This mediation resulted in no settlement. The claims against Dr. Mettetal were ultimately settled through a combined payment of $1 million by PHICO and EmCare and another $1 million by NUFIC as excess carrier.

The plaintiff asserts that subsequent to the settlement of the claims against Dr. Mettetal the defendants became aware that PHICO was in financial difficulty. PHICO was placed in liquidation on February 1, 2002, by the Pennsylvania Department of Insurance due to insolvency. Williams, Dr. Orr's counsel, was advised of the insolvency and continued to defend Dr. Orr pursuant to an agreement with the Mississippi Insurance Guaranty Association (MIGA). MIGA declined to indemnify Dr. Orr, however, contending that Dr. Orr continued to be covered through the NUFIC policy. NUFIC instituted a declaratory judgment action against MIGA seeking a declaration as to which entity was responsible for providing defense counsel and as to whether Dr. Orr was entitled to indemnity from MIGA in addition to that provided by the NUFIC policy. Thereafter Dr. Orr indicated that he was in favor of mediation and settlement of the claims

4

against him. NUFIC asserts that it ultimately agreed to retain separate defense counsel for Dr. Orr so that, in the event NUFIC failed to prevail in the declaratory judgment action, Dr. Orr would continue to have counsel prepared to defend him at trial. In January 2006 NUFIC agreed to settle the claims against Dr. Orr for $750,000.00. The declaratory judgment action was resolved against NUFIC in March 2006. The court found that MIGA was not required to contribute to the settlement and that NUFIC was required to reimburse MIGA for the defense costs incurred by the attorney initially retained by WLSI from the date of PHICO's insolvency through the termination of the litigation.

*Motion to Dismiss for Lack of Personal Jurisdiction*

Defendants Blasio and Fitzgibbon assert that under Mississippi law they are not subject to personal jurisdiction in this case. The defendants contend that they did not enter into a contract with the plaintiff; that they did not commit a tort in whole or in part in Mississippi; that they are not doing business in Mississippi; and that they lack minimum contacts with Mississippi. It is uncontested that Mr. Blasio never entered the state during the underlying *Wright* litigation and that Ms. Fitzgibbon entered only for the purpose of attending two mediations in the case.

As the plaintiff notes, the defendants waited almost a year and a half after the present case was filed and thirteen and a half months after their counsel filed an appearance before filing this motion to dismiss. They actively participated in discovery, motions, and the litigation process in general in this court during that time. For the reasons that follow, the court finds merit in the plaintiff's argument that the defendants have waived personal jurisdiction.

The Fifth Circuit recognizes the "well-established rule that parties who choose to litigate actively on the merits thereby surrender any jurisdictional objections." *PaineWebber, Inc. v.*

5

*Manhattan Private Bank (Switzerland)*, 260 F.3d 453 (5th Cir. 2001). Further, "[A] party can be held to have waived a defense listed in Rule 12(h)(1) through conduct, such as extensive participation in the discovery process or other aspects of the litigation of the case even if the literal requirements of Rule 12(h)(1) have been met...." 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1391 (3d ed. 2004).

The record reflects "extensive participation" in the litigation of this case on the part of the defendants. The defendants have issued non-party subpoenas, interrogatories, and requests for production of documents. They repeatedly invoked the jurisdiction of this court prior to filing the present motion by filing motions to compel, a motion for reconsideration, and motions for extension of time. Further, they have issued multiple deposition notices and have themselves sat for deposition pursuant to notices issued in this case. The defendants never contested jurisdiction during this time.

For these reasons, the court finds that the defendants have waived *in personam* jurisdiction in this case. The court's ruling is consistent with the rulings of other courts within this circuit and in other circuits. *See, e.g., Schwartz v. M/V Gulf Supplier*, 116 F. Supp. 2d 831, 835 (S.D. Tex. 2000) (finding that a personal jurisdiction defense raised in the defendant's answer was waived where defendant waited nine months to move to dismiss on that ground); *Continental Bank, N.A. v. Meyer*, 10 F.3d 1293, 1297 (7th Cir. 1993) (finding waiver where the defendants participated in the litigation for over two and a half years without contesting jurisdiction). As the court in *Meyer* noted, "[w]hile the defendants literally complied with Rule 12(h), they did not comply with the spirit of the rule, which is 'to expedite and simplify proceedings in the federal courts.'" *Meyer*, 10 F.3d at 1287 (quoting *Yeldell v. Tutt*, 913 F.2d

533, 539 (8th Cir. 1990)). The defendants' motion to dismiss for lack of personal jurisdiction shall be denied.

*Motion for Summary Judgment*

The court now turns to the defendants' motion for summary judgment. A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). On a motion for summary judgment, the movant has the initial burden of showing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). If the movant makes such a showing, the burden then shifts to the non-movant to "go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp.*, 477 U.S. at 324, 106 S. Ct. at 2553, 91 L. Ed. 2d at 274 (quoting Fed. R. Civ. P. 56(c), 56(e)). Before finding that no genuine issue for trial exists, the court must first be satisfied that no rational trier of fact could find for the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538, 552 (1986).

The court will first address the defendants' statute of limitations argument. The defendants assert that five years elapsed between the time they last acted in regard to the *Wright* case and the date the present case was filed – April 24, 2006. This lapse of time would place the plaintiff's claims outside Mississippi's general three-year statute of limitations as well as the one-year statute of limitations applicable to claims for intentional torts. Miss. Code Ann. §§ 15-1-35,

-49. The plaintiff alleges intentional and/or negligent misrepresentation, fraud, conspiracy to commit a fraud, equitable subrogation, and bad faith breach of the duty of good faith and fair dealing. The plaintiff contends that the applicable statutes of limitations were tolled due to fraudulent concealment and the discovery rule. According to the plaintiff, the statutes of limitations did not begin to run until it learned of the defendants' alleged misrepresentations in a letter from Tommie Williams dated April 25, 2005. If the court determines this to be the case, then all claims will fall safely within either limitations period since the action was filed within one year on April 24, 2006.

Claims that are time-barred under the applicable statute of limitations "may still be actionable if they were fraudulently concealed and plaintiffs could not discover them with reasonable diligence." *Bentley v. Mut. Benefits Corp.*, 253 Fed. Appx. 358, 362 (5th Cir. 2007) (quoting *Ross v. Citifinancial, Inc.*, 344 F.3d 458, 463 (5th Cir. 2003)). "In that event, the limitations period begins to run when the claims are discovered." *Id.* This doctrine is codified in Miss. Code Ann. § 15-1-67, which provides in relevant part:

> If a person liable to any personal action shall fraudulently conceal the cause of action from the knowledge of the person entitled thereto, the cause of action shall be deemed to have first accrued at, and not before, the time at which such fraud shall be, or with reasonable diligence might have been, first known or discovered.

According to the Mississippi Supreme Court, Section 15-1-67 requires proof of two elements: (1) "subsequent affirmative acts of concealment" and (2) "due diligence." *Andrus v. Ellis*, 887 So. 2d 175, 181 (Miss. 2004). "That is, there must be some subsequent affirmative act by the defendant which was designed to prevent and which did prevent discovery of the claim." *Id.*

The plaintiff asserts that defendant Blasio entered into a secret agreement with John Cocke, the *Wright* plaintiffs' attorney, to cause NUFIC to pay its $1 million coverage on Dr. Mettetal which, combined with $1 million from PHICO, would result in a $2 million settlement – a satisfactory amount for the *Wright* plaintiffs. The plaintiff asserts that the defendants fraudulently concealed this alleged scheme and agreement with Mr. Cocke from NUFIC. In support of its argument, the plaintiff quotes e-mail messages from Mr. Blasio to certain contacts at PHICO. First, Mr. Blasio e-mailed PHICO's Brent Hoffman stating:

> Assuming AIG [NUFIC] agrees that it is excess of each physician's $1 million limit, I believe that is a very favorable development in this case. Under that scenario, I have no problem approaching plaintiff's counsel about trying to have Dr. Orr dismissed and tendering the $1 million primary limits with Dr. Mettetal, who has repeatedly called me and asked that we take every step necessary to settle the case on his behalf. Since the plaintiff's demand has been $2 million for the case, this will limit our exposure on the file to $1 million and place AIG in the crosshairs.

Later Mr. Blasio e-mailed PHICO's Scott Liebel stating in pertinent part:

> Our plan of attack has been to offer our $1 million limit on behalf of Dr. Mettettal and refuse to pay any money on behalf of Dr. Orr. This $1 million offer should be tendered to National Union and the plaintiffs will then demand $2 million as to Dr. Mettetal, thereby putting National Union in the hot seat.

This scheme required that Dr. Orr, who had previously expressed his desire to settle the case, withdraw his consent to settle so that Dr. Mettetal's excess coverage from NUFIC would kick in. According to the plaintiff, Dr. Orr never withdrew his consent to settle although the defendants fraudulently misrepresented that he did. Specifically, the plaintiff asserts that misrepresentations occurred when Tommie Williams stated in his January 9, 2001, letter that Dr. Orr had withdrawn his consent and when Katherine Fitzgibbon reiterated this statement at the January 15, 2001, mediation. The plaintiff also accuses Ms. Fitzgibbon of initially misrepresenting that a total of

9

only $1 million of *combined* coverage was available under the PHICO policy for both doctors when, in fact, *each* doctor had $1 million in PHICO coverage. Ms. Fitzgibbon admits she made this error, but the record reveals that she corrected the error shortly thereafter.

The claims against Dr. Mettetal were eventually settled for $2 million with $1 million contributed by EmCare/PHICO and $1 million by NUFIC. The plaintiff alleges that it agreed to this settlement because it relied on the defendants' misrepresentations and concealment of material facts.

The plaintiff alleges that Tommie Williams, who is not a defendant herein, refused a request of NUFIC attorney Wes Williams to meet with him and Dr. Orr concerning the case. Wes Williams' letter of February 22, 2001, requested that the meeting take place the following week, if possible. Tommie Williams responded on February 26, 2001, that he would not be able to meet with Wes Williams and Dr. Orr during that week as he was going to be out of town on business. Tommie Williams went on to state, however, that Wes Williams was "certainly invited to come by and discuss this with me at any time. If you have any particular questions, I will do my very best to answer them for you." Wes Williams never accepted the invitation. The plaintiff asserts that it did not learn of the defendants' misrepresentations until April 2005 when, in response to an inquiry by Wes Williams about Dr. Orr's position on settlement at that time, Tommie Williams stated that the letter withdrawing Dr. Orr's consent to settle back in 2001 was written at the request of Mr. Blasio. Tommie Williams' April 25, 2005, letter to this effect stated in relevant part:

> At that time [early 2001] Mr. Rob Blasio was attempting to negotiate the settlement of the case. He concluded that, if he paid the policy limits available to one of the ER physicians, John Cocke would dismiss the case against the

> remaining doctor. Because the plaintiffs' case was felt to be strongest against Dr. Mettetal, Mr. Blasio asked me to write the letter you asked about. Mr. Blasio said he needed this letter to convince Mr. Cocke that Dr. Orr was not willing to settle. Remember, we had been in mediation, making offers on Dr. Orr's behalf in December of 1999. Blasio wanted something in writing to convince John Cocke that Dr. Orr had changed his mind regarding settlement. After explaining Mr. Blasio's plan to Dr. Orr, he agreed. According to Mr. Blasio, the end result of all of this would be that Dr. Mettetal's policy limits would be paid and the case would be dropped against Dr. Orr . . . . There really was never any change in our position or Dr. Orr's position regarding settlement.

The plaintiff contends that the statute of limitations was tolled until the date of this letter – April 25, 2005.

In determining the statute of limitations issue, the court notes that the "affirmative act of fraudulent concealment" must occur "post-completion of the fraudulent act in order to toll the statute of limitations." *Archer v. Nissan Motor Acceptance Corp.*, 2007 U.S. Dist. LEXIS 65570, at *15 (S.D. Miss. 2007) (quoting *Ross*, 344 F.3d at 464)). The alleged fraudulent acts occurred on January 9, 2001, when Tommie Williams wrote the letter withdrawing Dr. Orr's consent to settle and on January 15, 2001, when Katherine Fitzgibbon reiterated Dr. Orr's position at the mediation. The plaintiff has alleged only one "post-completion" affirmative act of fraudulent concealment. According to the plaintiff, this act occurred when Tommie Williams wrote his February 26, 2001, letter declining to meet with Wes Williams. The plaintiff's position on the statute of limitations issue, therefore, hinges on the conclusion that this letter was an act of fraudulent concealment. The court does not draw this conclusion. Tommie Williams' letter clearly invites Wes Williams "to come by and discuss this [matter] with me at any time. If you have any particular questions, I will do my very best to answer them for you." Tommie Williams' alleged refusal to meet with Wes Williams was not a refusal at all but simply a

11

scheduling conflict for the particular time for which Wes Williams requested the meeting.

Having found no "post-completion" affirmative act of fraudulent concealment, it is unnecessary for the court to examine the second prong of the fraudulent concealment test – due diligence to discover the factual basis for the claims. The court notes, however, that although no invitation was required for NUFIC to speak with its own insured, it failed to contact Dr. Orr and did not pursue a meeting with Tommie Williams once Mr. Williams expressed a scheduling conflict. Assuming arguendo that the defendants did commit a post-completion affirmative act of fraudulent concealment, the Fifth Circuit has held that "an act of concealment should not relieve the plaintiff of his duty to exercise reasonable diligence to discover the fraud." The court finds that NUFIC did not exercise reasonable diligence in this case.

Because the plaintiff's claims are barred by the applicable statutes of limitations, the court finds that the defendants are entitled to judgment as a matter of law. Had the plaintiff's claims been filed within the statutory period, the court would have nevertheless granted summary judgment in favor of the defendants. The plaintiff relies heavily on its contention that Dr. Orr's withdrawal of consent to settle was a fraudulent misrepresentation. The record, however, reveals that Dr. Orr agreed to withdraw his consent to settle. The plaintiff cannot genuinely contest this fact. Whether Dr. Orr did so at the request of his attorney or of his own accord and whether he did so sincerely or as part of a litigation strategy are irrelevant questions. As the defendants note, Dr. Orr was certainly entitled "to withdraw his consent to settle in an attempt to be dismissed without payment, while also hoping that the case is dismissed or settled prior to trial."

Furthermore, NUFIC had a contractual obligation to Dr. Mettetal for $1 million in excess coverage. It is basically uncontested that Dr. Mettetal was primarily at fault and that Dr. Orr was

significantly less culpable. NUFIC asserts that the defendants caused it to make a payment "that it otherwise would not have been required to make." To the contrary, the record reveals that NUFIC made a payment that it was required to make pursuant to its agreement with Dr. Mettetal. The $750,000 payment NUFIC made on behalf of Dr. Orr was also made under a contractual obligation. The coverage set forth in the NUFIC policy was considered primary unless the insured already had primary coverage from another carrier. PHICO's insolvency resulted in NUFIC's having to pay on behalf of Dr. Orr as his primary carrier. But for PHICO's insolvency, NUFIC would not have been responsible for the payment. The NUFIC policy would have remained as excess coverage. This fact does not impute liability to the defendants, however. The defendants were not responsible for PHICO's insolvency; and while the plaintiff has asserted that the defendants knew of the pending insolvency before June 2001 and concealed the matter from NUFIC, the plaintiff has directed the court to no evidentiary support for its allegation. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1429 (5th Cir. 1996) (stating that "conclusory allegations, speculation, and unsubstantiated assertions are inadequate to satisfy the nonmovant's burden" at the summary judgment stage of a case); *Turner v. Baylor Richardson Medical Center*, 476 F.3d 337, 343 (5th Cir. 2007) (stating that a "party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or 'only a scintilla of evidence'"). The plaintiff has likewise failed to show why it is entitled to "all attorneys' fees and costs incurred by Dr. Orr's defense counsel after PHICO's insolvency and by NUFIC's counsel after the January 2000 settlement demand."

The court is also unpersuaded by the plaintiff's claim of bad faith. A primary insurer such as PHICO does not owe a duty of care or good faith performance to the excess insurer of its

13

insured, such as NUFIC.  *See Travelers Indem. Co. of Illinois v. Western Am. Specialized Transp. Serv., Inc.*, 409 F.3d 256, 260 (5th Cir. 2005).  Since PHICO owed no such duty to NUFIC, common sense dictates that neither EmCare, PHICO's insured, nor WLSI or its employees would owe such a duty.  For this reason, the plaintiff's bad faith claim is without merit.

Finally, the court rejects the plaintiff's claim of equitable subrogation.  This doctrine allows an excess insurer to sue a primary insurer by asserting the insured's rights after becoming subrogated to them.  *Id. at* 260-61.  "It is elementary that, before an excess insurer can recover from a primary insurer under the doctrine of equitable subrogation, the excess insurer must first prove that the primary insurer failed to fulfill a duty owed to the insured."  *General Star Indem. Co. v. Vesta Fire Ins. Corp.*, 173 F.3d 946, 949 (5th Cir. 1999).  Because the primary insurer's policy of insurance carries an obligation "to look after the insured's interest at least to the same extent as its own, and also to make a knowledgeable, honest, and intelligent evaluation of the claim," an excess insurer who becomes subrogated to its insured's rights may bring suit based upon a breach of that duty pursuant to the equitable subrogation doctrine.  *Hartford Acc. & Indem. Co. v. Foster*, 528 So. 2d 255, 265 (Miss. 1988).  The primary insurer in the present case is PHICO, which NUFIC did not sue.  NUFIC sued EmCare, PHICO's insured, WLSI, and WLSI employees Rob Blasio and Katherine Fitzgibbon.  These defendants made no policy of insurance upon which NUFIC can base its claim of equitable subrogation.  If the court were to adopt the plaintiff's position that the defendants can stand in the place of PHICO in regard to NUFIC's equitable subrogation claim, the claim nevertheless fails because the plaintiff has not shown that the defendants "failed to fulfill a duty owed to the insured."  *General Star Indem. Co.*, 173 F.3d at 949.

The court thus finds that even if the plaintiff's claims were not barred by the applicable statutes of limitations, the plaintiff has presented no genuine issues of material fact in regard to its claims. The plaintiff is, therefore, entitled to judgment as a matter of law.

*Conclusion*

For the foregoing reasons, the court finds that the motion of defendants Robert Blasio and Katherine Fitzgibbon to dismiss for lack of personal jurisdiction is not well taken and shall be denied. The defendants' motion for summary judgment is well taken and shall be granted. The plaintiff's motion to strike the affidavit of Brent Hoffman is denied as moot because the court did not consider Mr. Hoffman's testimony in reaching its decision. A separate order in accord with this opinion shall issue this day.

This, the 23rd day of May, 2008.

/s/ Neal Biggers
_____
**NEAL B. BIGGERS, JR.
SENIOR U.S. DISTRICT JUDGE**